# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

EDWARD L. PRINGLE,           *

                                 *

    **Plaintiff,**             *

                                 *

vs.                          *   **CIVIL ACTION NO. 20-00294-KD-B**

                               *

WEXFORD MEDICAL SOURCES, INC., *
*et al.*,                    *

                               *

    **Defendants.**           *

## REPORT AND RECOMMENDATION

Plaintiff Edward L. Pringle, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed a complaint under 42 U.S.C. § 1983. (Doc. 1). This action has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and S.D. Ala. GenLR 72(a)(2)(R) and is now before the Court on Defendants' motion for summary judgment. (Docs. 13, 17, 20). After careful review of the pleadings, and for the reasons set forth below, it is recommended that the motion for summary judgment be **GRANTED,** and that this action be **DISMISSED with prejudice.**

## I.   PROCEDURAL AND FACTUAL BACKGROUND[1]

Plaintiff Edward L. Pringle ("Pringle") brings this action against Defendants Wexford Health Sources, Inc. ("Wexford") and

---

[1] The Court notes that "the 'facts', as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000).

Dr. Manuel Pouparinas, M.D. ("Dr. Pouparinas") for inadequate medical care while within the custody of the Alabama Department of Corrections ("ADOC").[2]

In Pringle's operative amended complaint (Doc. 7), he brings claims against Dr. Pouparinas and Wexford for failing to adequately treat his infected left middle toe, which he alleges resulted in the amputation of his left lower leg. (See id. at 4-8). Pringle also attaches a "Statement of Facts" setting forth legal and medical arguments, descriptions of his treatment before and after his below-knee amputation, and references to various complaints and grievances he filed regarding his medical treatment and conditions. (See id. at 11-17).

According to Pringle, his left middle toe became infected in January 2018 while he was under the care of Dr. Pouparinas, who was the Medical Director at Holman Correctional Facility ("Holman"), where Pringle is incarcerated. (Doc. 7 at 4; Doc. 17-

---

[2] After screening Pringle's original complaint (Doc. 1) and determining that it did not comply with Federal Rule of Civil Procedure 8(a)(2) and the directions in this Court's form complaint for § 1983 prisoner actions, the undersigned ordered Pringle to file an amended complaint. (Doc. 6). Pringle filed an amended complaint (Doc. 7) pursuant to the Court's order, which is now his operative pleading. While his original complaint named at least six Defendants, including Wexford, Dr. Pouparinas, Alabama Governor Kay Ivey, ADOC Commissioner Jefferson Dunn, and two Wexford nurses, the operative amended complaint names only Wexford and Dr. Pouparinas as Defendants. (See Docs. 1, 7).

1 at 2).  Pringle alleges that Dr. Pouparinas and Wexford[3] acted with deliberate indifference by failing to timely and adequately treat his toe to prevent it from developing gangrene and to prevent the gangrene from spreading, thereby resulting in the amputation of Pringle's left lower leg in July 2018.[4]  (Doc. 7 at 4-8).

Pringle claims that Wexford's corporate policy of requiring approval of "any medical tools, including surgeries and treatments . . . before any medical procedures begins" in order "to save money," created "long delays from diagnosis until treatment," which, in turn, caused his toe to develop gangrene and allowed "the gangrene to spread and invade the lower left leg." (Id. at 4-5).

In his attached "Statement of Facts," Pringle refers to various complaints and grievances he submitted regarding his medical treatment *after* the amputation, including alleged failures to timely provide him with physical therapy after the surgery, to

---

[3] Although Pringle alleges inadequate treatment beginning in January 2018, Defendants aver, and Pringle does not dispute, that Wexford did not assume the contract to provide healthcare services to Alabama state inmates until March 1, 2018.  (Doc. 17 at 2; Doc. 17-1 at 3).  The contract to provide healthcare services to inmates within ADOC was previously held by Corizon, LLC.  See Tate v. Scott, 2021 U.S. Dist. LEXIS 74850, at *3, 2021 WL 2098963, at *1 (S.D. Ala. Apr. 16, 2021).  It appears that Dr. Pouparinas was employed as the Medical Director at Holman under both Corizon and Wexford.

[4] Pringle alleges that Wexford failed "to intervene" and instead "agreed with" Dr. Pouparinas's inadequate method of treatment. (Doc. 7 at 5).

furnish him a properly fitting prosthetic leg, to order "reconstructive surgery" to help him wear his prosthesis, and to provide the prosthetic shoes he requested. (See id. at 14-17). Pringle seeks damages from Defendants in the amount of $300,000. (Id. at 10).

Defendants Dr. Pouparinas and Wexford have answered Pringle's suit and deny the allegations against them. (Doc. 13). They have also provided a special report in support of their position. (Doc. 17). The special report includes the declaration of Dr. Pouparinas, pertinent medical records of Pringle, and Pringle's inmate movement history. (Docs. 17-1, 17-2, 17-3, 17-4, 17-5, 17-6, 17-7, 17-8, 17-9).

The medical records submitted by Defendants reflect that Pringle's medical history includes diagnoses of hypertension, hepatitis C, ischemic vascular disease, and blood clots. The records reflect that Pringle underwent five surgeries between May 2016 and December 2017 to address problems with left leg circulation. Specifically, the medical records reflect that Pringle had the following surgeries: a left superficial femoral artery balloon angioplasty with stenting on May 23, 2016; a left femoral-popliteal below-the-knee bypass graft on April 26, 2017; a left femoral-popliteal thrombectomy and bovine pericardial patch on August 3, 2017; a left femoral-popliteal above-the-knee bypass graft vein inadequate on November 20, 2017; and a left femoral-

popliteal below-the-knee reverse saphenous vein bypass graft harvest vein from right leg on December 26, 2017. (Doc. 17-4 at 15). Before the December 2017 surgery, Dr. Pouparinas assessed Pringle with three left leg thrombi.[5] (Doc. 17-2 at 5; Doc. 17-4 at 15). Following the surgery, Pringle was admitted to Holman's infirmary on December 30, 2017 and was discharged on January 22, 2018. (Doc. 17-2 at 6).

On January 25, 2018, Pringle reported in a sick call request that his left middle toe was swollen and black and did not look right. (Id. at 117). He was seen that day by a nurse, who noted necrosis and tenderness to his left third toe. (Id. at 119). In a sick call request dated January 30, 2018, Pringle reported pain and swelling in his left foot and soreness under his left middle toe. (Id. at 122). He was seen by a nurse and referred to a practitioner. (Id. at 123-24). On February 2, 2018, Pringle submitted another sick call request and reported infection of his left middle toe with odor. (Id. at 126).

Pringle was seen at Holman's health care unit on February 6, 2018 and reported that his toe had been infected for approximately

---

[5] "A thrombus is a blood clot that forms in a vessel and remains there. . . . Thrombi . . . can lodge in a blood vessel and block the flow of blood in that location depriving tissues of normal blood flow and oxygen. This can result in damage, destruction (infarction), or even death of the tissues (necrosis) in that area." https://medlineplus.gov/ency/imagepages/18120.htm (last visited Jan. 12, 2022).

two weeks.  (Id. at 127).  Dr. Pouparinas admitted Pringle to the infirmary for necrosis of the left third toe[6] and started him on oral and topical antibiotic therapy.[7]  (Doc. 17-2 at 128; Doc. 17-3 at 6-7, 10, 12-13).  Pringle was also given daily IV infusions of the antibiotic Vancomycin.  (Doc. 17-3 at 90).

On February 9, 2018, Dr. Pouparinas submitted a consultation request for Pringle to see his vascular surgeon.  (Id. at 32).  In the request form, Dr. Pouparinas noted that Pringle had an "open distal 3rd toe vascular wound with eschar and necrosis" and continued to receive antibiotic medication and daily wound care.  (Id.).  On February 14, 2018, left foot x-rays were taken, which showed degenerative changes but no acute osseous abnormality.  (Id. at 60).  The following day, Pringle was seen offsite by his vascular surgeon, Rip Pfeiffer, M.D.  (Id. at 64-66).  Dr. Pfeiffer examined Pringle's left foot and directed that the affected toe be cleaned with alcohol twice per day and left open to air.  (Id. at 64-65).  In a letter to Dr. Pouparinas dated February 15, 2018, Dr. Pfeiffer stated: "He will return to see me in a couple of

---

[6] Dr. Pouparinas assessed Pringle with vascular disease with an open wound on the left third toe.  (Doc. 17-3 at 6).

[7] Orders were placed for Cipro 500 mg twice a day for ten days and wound care that included the application of Bactroban ointment.  (Doc. 17-3 at 12-13).  The wound care orders were changed on February 7, 2018 to include painting with Betadine rather than applying Bactroban ointment.  (See id. at 10).  Pringle was also given medication for pain.  (See id. at 24).

months for a routine follow-up visit.  The ischemic toe problems should resolve with conservative therapy." (Id. at 66).

On February 21, 2018, Dr. Pouparinas noted that Pringle's wound was improved, with no drainage and no signs of infection. (Id. at 107).  He discharged Pringle from the infirmary, listed Pringle's discharge status as improved and stable, and ordered the continuation of daily wound care and a follow-up appointment in one week.  (Id.).  At discharge, Pringle's medications included fourteen-day prescriptions for the antibiotic Cipro and the pain medication Ultram.  (See id. at 107, 109-10).

Pringle submitted a sick call request on March 4, 2018. (Id. at 112).  He reported pain and swelling in his left foot and ankle and changing coloration around his heel.  (Id.).  He was seen the next day in the chronic disease clinic by Dr. Pouparinas, who assessed Pringle with severe peripheral vascular disease and a vascular ulcer in the second distal toe.[8]  (Id. at 113).  Pringle's list of current medications on that date included Ultram, Vancomycin, Tylenol, the anticoagulant Coumadin,[9] and the nerve

---

[8] It is not clear whether this isolated handwritten reference to the "2nd" distal toe was a misstatement and should have instead referenced Pringle's third toe, given that it was the third toe that was the subject of Pringle's relevant sick call requests. (See Doc. 17-3 at 113).

[9] Coumadin "is used to treat blood clots (such as in deep vein thrombosis-DVT or pulmonary embolus-PE) and/or to prevent new clots from forming in your body. . . .  It helps to keep blood flowing smoothly in your body by decreasing the amount of certain

pain medication Neurontin.  (See id.).  On March 19, 2018, Pringle placed a sick call request which stated: "Left foot.  Constant pain, swelling around both side, especially instep, back of the heel, and running pain across the toes.  All apart of the effected middle toe. 'Poor blood circulation.'"  (Id. at 115).  He was evaluated that day by a nurse practitioner, who noted a necrotic third toe and +1 edema to the left lower extremity and referred him "to MD for ongoing problem."  (Id. at 116).

On April 3, 2018, Pringle reported lower extremity edema.  (Id. at 70).  He acknowledged that he only wore his TED hose at night and was counseled to "wear while up in daytime."  (Id.).  At the chronic disease clinic in April 2018, Pringle reported dry skin and frequent nighttime urination.  (Id. at 118).  A physical examination of his extremities revealed only dry skin, and his list of current medications at that point no longer included Vancomycin, Ultram, or Tylenol.  (See id.).  Significantly, on April 24, 2018, the medical records reflect that the area to Pringle's left third toe had resolved, that the eschar was completely removed, and that the new skin was pink.  (Id. at 70).

On May 15, 2018, Pringle presented to the chronic disease clinic and reported ongoing nerve pain in his left foot.  (Id. at

_____

substances    (clotting    proteins)    in    your    blood." https://www.webmd.com/drugs/2/drug-4069/coumadin-oral/details (last visited Jan. 12, 2022).

129).  It was noted on examination that Pringle had a necrotic third toe, dry skin, and no edema.  (Id.).  It was further noted that Pringle had been noncompliant with his Gabapentin and Coumadin prescriptions.  (Id.).  A comprehensive metabolic panel was ordered, and Pringle was directed to continue his current medications and weekly INR testing for blood clotting.  (Id.).

On May 28, 2018, Pringle submitted a sick call request for his left ankle, left heel bone spurs, and left middle toe infection.  (Id. at 127).  Pringle stated that his medication was not helping and reported pain running from tip of his toe to his knee.  (Id.).  He was seen by a nurse, who noted mild swelling around the ankle and a left foot that was cool to the touch.  (Id. at 128).  The nurse's notes reflect that she had spoken with Dr. Pouparinas and would administer Tylenol #4.  (See id.).

Pringle presented to the clinic on May 29, 2018 and reported left foot pain that had started one day earlier while he was walking.  (Doc. 17-4 at 2).  Pringle's pain was described as "a throbbing ache with needle shooting through the foot."  (Id.).  Pringle's blood pressure was 202/83.  (Id.).  An examination of Pringle's lower extremity revealed the presence of a pedal pulse, an audible bruit, capillary refill greater than three seconds, and a left middle toe stasis ulcer.  (Id.).  Pringle was assessed with a left stasis ulcer, left heel tenderness, left foot pain, neuropathy, arterial insufficiency, and hypertension.  (Id.).  He

was instructed on compliance with Gabapentin, directed to take his blood pressure medication immediately, prescribed NSAIDs for fourteen days, and advised to consider a trigger point injection if the pain persisted. (Id.). Pringle presented again on May 30, 2018 and reported left ankle pain. (Id. at 3). Pringle had non-pitting edema to his medial ankle, the skin on his left foot was cool to the touch, and no pedal pulse could be detected by Doppler ultrasound. (Id.). It was noted: "Dr. Pouparinas notified[. R]eceived orders to order doppler in AM & Tylenol #4 x 1 administered." (Id.).

On June 4, 2018, Pringle presented for follow-up treatment of left foot pain, which he reported was worse on the plantar surface of the foot and worse when taking steps. (Id. at 4). Pringle was assessed with left foot plantar fasciitis and received a Kenalog injection and exercise education, and a left foot x-ray and foot orthotics were ordered.[10] (Id.). On June 8, 2018, Pringle reported through a sick call request that his left middle toe was infected with a scent, and that he had pain from his ankle to the middle of his calf. (Id. at 9). Instructions consisting of "[w]ound care between third & fourth toe clean & apply dry dressing until healed" were prescribed. (Id.). And, Pringle was scheduled

_____

[10] Pringle was issued heel cups and a tennis ball for his left foot pain on June 6 and 7, 2018. (Doc. 17-4 at 6-7).

for an appointment with Dr. Pfeiffer[11] on July 3, 2018. (Id. at 10). The appointment with Dr. Pfeiffer was later moved up to June 28, 2018. (Id. at 17).

At the chronic disease clinic on June 15, 2018, Pringle complained of left foot pain that had been ongoing for almost a month. (Id. at 11). It was noted that Pringle had been treated for fasciitis and given TED hose to promote venous return, but his pain had not improved. (Id.). On examination, Pringle had a necrotic left toe and weak pedal pulses. (Id.). It was noted that Pringle had been referred to a specialist, and he was directed to increase his dosage of the diuretic Hydrochlorothiazide.[12] (Id.).

On June 21, 2018, Pringle submitted a sick call request wherein he reported that he was "being removed from treatment due to the 2 [weeks] limit" despite his left middle toe still being infected and emitting a scent, that he did not receive antibiotics during his treatment, and that he was not receiving proper treatment. (Id. at 13). In response to the request, it was noted: "Meds renewed per CRNP on 6-22-18. Sick call cancelled." (Id.).

---

[11] The June 8, 2018 referral request to Dr. Pfeiffer noted that Pringle had left foot pain that had worsened over the past month, left foot numbness, and malodor. (Doc. 17-4 at 10).

[12] Pringle's list of current medications at the chronic disease clinic on June 15, 2018 included Hydrochlorothiazide, Neurontin, Ultram, and Coumadin, but did not include an antibiotic. (See Doc. 17-4 at 11).

On June 28, 2018, Pringle was examined by Dr. Pfeiffer.  (Id. at 14-16).  Pringle's left ankle-brachial index showed an absent/faint signal, his pedal pulses were absent, and there was no blood flow in his left saphenous vein graft.  (Id. at 14).  Dr. Pfeiffer diagnosed Pringle with atherosclerosis of the left leg native artery with intermittent claudication and stated that Pringle needed a left below-knee amputation ("BKA").[13]  (Id. at 14, 16, 19).  Wound care was ordered for the area between Pringle's third and fourth toes.  (Id. at 20).  On July 5, 2018, Dr. Pouparinas signed a referral request for a left BKA.  (Id. at 21).  Pringle was seen by a nurse on July 6 and 8, 2018, and was given pain medication and wound care.  (Id. at 23-26).

On July 9, 2018, it was noted that Pringle's left foot was black and smelly with gangrene from mid-foot down to the toes, secondary to severe peripheral vascular disease.  (Id. at 29).  Pringle was given two Tylenol #3 tablets and immediately transported to Mobile Infirmary via ambulance for left BKA surgery, which Dr. Pfeiffer performed that day.[14]  (Id. at 28-29).

---

[13] In the provider consultation report from Pringle's evaluation on June 28, 2018, Dr. Pfeiffer wrote: "Failed attempt to save [left] leg – needs [left] BK amputated."  (Doc. 17-4 at 19).

[14] In the operative report for Pringle's left BKA, Dr. Pfeiffer noted that Pringle "tolerated the procedure well."  (Doc. 17-4 at 28).

In response to the allegations in Pringle's complaint, Dr. Pouparinas affirms that he is currently employed by Wexford as the Medical Director at Bibb County Correctional Facility, and that he previously served as the Medical Director at Holman. (Doc. 17-1 at 2). Dr. Pouparinas notes that Pringle has been treated for severe vascular problems during his many years of incarceration and has been hospitalized for medical conditions related to his vascular issues on many occasions. (Id. at 17). Dr. Pouparinas avers that Pringle "has had surgeries for his vascular issues that had necessitated surgery and amputation of his left leg below the knee," and that the left BKA "surgery was necessary due to the vascular and health issues of Mr. Pringle." (Id.). Dr. Pouparinas further notes that Pringle received physical therapy and two different prosthetic limbs following his left BKA and has been seen by many outside specialists for his medical needs. (Id. at 18). Dr. Pouparinas opines that based on his education, training, experience, and personal knowledge of Pringle's health history and needs, Pringle "has at all times received health care within the standard of care of physicians practicing medicine in the state of Alabama." (Id.). Dr. Pouparinas further opines that "at all relevant times [he] acted within the standard of care of physicians practicing medicine in the state of Alabama." (Id.).

In an order dated April 22, 2021, the Court converted Defendants' answer and special report (Docs. 13, 17) into a motion

for summary judgment, explained to the parties the procedure for such motions under Federal Rule of Civil Procedure 56, and afforded the parties an opportunity to submit additional information or evidence in support of or in opposition to the motion. (Doc. 20). Pringle filed a sworn response opposing summary judgment. (Doc. 22). The motion for summary judgment is now ripe for consideration.

## II.  **SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing there is no

genuine dispute of material fact, or by showing or pointing out to the district court that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-24.

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (per curiam) (quoting Celotex, 477 U.S. at 324).  "To defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations.' It must raise 'significant probative evidence' that would be sufficient for a jury to find for that party."  LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir. 1998) (citations omitted).  Where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007).  There is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In considering whether the Defendants are entitled to summary judgment in this case, the Court views the facts in the light most favorable to Plaintiff Pringle.  See Comer v. City of Palm Bay, Fla., 265 F.3d 1186, 1192 (11th Cir. 2001) (per curiam) ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts.  A genuine dispute requires more than "some metaphysical doubt as to the material facts."  A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (2009) (per curiam) (internal citations omitted).  In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995).

### III. <u>DISCUSSION</u>

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.  Under the Eighth Amendment, state governments "have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration."  Harris v. Thigpen, 941 F.2d 1495,

1504 (11th Cir. 1991). Prison officials violate the proscription on cruel and unusual punishments when they exhibit "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104 (1976).[15]

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). To establish the objective element, the plaintiff must demonstrate the existence of an "objectively serious medical need." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004). "[A] serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow, 320 F.3d at 1243 (quotation omitted). "In either case, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Brown, 387 F.3d at 1351 (quotation omitted).

To meet the subjective element, a plaintiff must demonstrate that the prison official acted with an attitude of "deliberate

---

[15] In addition to Pringle's constitutional claims, Defendants' special report also addresses potential medical malpractice claims by Pringle. (See Doc. 17 at 28-34). However, Pringle's response to the special report makes clear that he is not raising claims for medical malpractice against either Defendant. (See Doc. 22 at 8-11).

indifference" to the serious medical need.  <u>Farrow</u>, 320 F.3d at 1243.  To establish deliberate indifference, "the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm;[16] (2) disregard of that risk; and (3) by conduct that is more than mere negligence."  <u>Brown</u>, 387 F.3d at 1351.

"Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all."  <u>Bingham v. Thomas</u>, 654 F.3d 1171, 1176 (11th Cir. 2011) (per curiam).  Even where medical care is ultimately provided, a prison official may act with deliberate indifference by delaying the treatment of serious medical needs.  <u>McElligott v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir. 1999).  However, courts consider "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay" in determining whether a delay amounts to a constitutional violation.  <u>Goebert v. Lee County</u>, 510 F.3d 1312, 1327 (11th Cir. 2007).

---

[16] "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  Each individual defendant must be judged separately and on the basis of what that person kn[ew]."  <u>Nam Dang v. Sheriff, Seminole Cty. Fla.</u>, 871 F.3d 1272, 1280 (11th Cir. 2017) (quotation omitted).

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm." Id.

"A prisoner bringing a deliberate-indifference claim has a steep hill to climb." Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1266 (11th Cir. 2020), cert. denied sub nom. Keohane v. Inch, 142 S. Ct. 81 (2021). Medical treatment violates the Eighth Amendment "only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Harris, 941 F.2d at 1505 (quotation omitted). Medical malpractice, misdiagnosis, accidents, and poor exercise of medical judgement are insufficient to support a claim of deliberate indifference. See Estelle, 429 U.S. at 104-07. "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment." Harris, 941 F.2d at 1505.

With these principles in mind, the Court turns to Pringle's claims against the Defendants.

**A. Defendant Dr. Pouparinas.**

Pringle claims that Dr. Pouparinas was deliberately indifferent to his serious medical need to obtain prompt and adequate treatment of his left middle toe. (Doc. 7 at 6-7). Specifically, Pringle alleges that Dr. Pouparinas's failure to

adequately treat his left middle toe caused the toe to develop gangrene; that Dr. Pouparinas did not adequately treat the gangrenous toe, which caused gangrene to spread to his left foot; and that Dr. Pouparinas then failed to act immediately to stop the spread of gangrene to the left lower leg, which led to the left BKA. (Id.). As best the Court can discern, Pringle contends that Dr. Pouparinas should have known that treating the toe with wound care and antibiotics was futile and should have instead ordered the amputation of the toe to prevent infection/gangrene from spreading beyond the affected toe. (See Doc. 7 at 4-5; Doc. 22 at 1-3, 7-8). Pringle suggests that his necrotic toe was "dead" and asserts that "[a]ntibiotic treatment for a dead toe . . . is like no treatment at all." (Doc. 22 at 8).

For purposes of this motion, the Court assumes that Pringle's peripheral vascular disease and ischemic toe problems constitute a serious medical need, a finding Defendants do not dispute. (See Doc. 17 at 23). To establish a constitutional violation, Pringle must show that Dr. Pouparinas acted with deliberate indifference to his serious medical need through disregard of a known risk of serious harm by conduct that is more than negligence. See Brown, 387 F.3d at 1351. However, as explained below, Pringle has failed to show that the medical treatment he received under Dr. Pouparinas was grossly inadequate or incompetent, or intentionally or unduly delayed. See Whitley v. Albers, 475 U.S. 312, 319 (1986) ("It is

obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause.").

Defendants have put forth evidence showing that the medical staff at Holman regularly examined and treated Pringle regarding his chronic vascular conditions, ischemic toe and foot problems, and many other complaints and conditions, consistently made referrals to specialists, administered medications, furnished medical devices, and made necessary referrals for surgical procedures. Although Pringle complains of the "long delay of (6) six months" between his January 2018 diagnosis and his July 2018 below-knee amputation, the medical evidence of record reflects that Pringle's ischemic toe problems were treated promptly, and that the treatment provided was far from cursory or grossly inadequate.

The records are replete with medical attention and treatment promptly provided to Pringle in response to his complaints and sick call requests. Dr. Pouparinas promptly admitted Pringle to the infirmary for his toe wound and necrosis; ordered antibiotic treatment, wound care, pain medication, and TED hose; and referred Pringle to a free-world vascular surgeon to evaluate his underlying vascular issues. (Doc. 17-2 at 128; Doc. 17-3 at 6-7, 10, 12, 32, 70, 90). Only six days after Dr. Pouparinas completed the consultation request, Dr. Pfeiffer examined Pringle's left foot

and provided treatment recommendations. (Doc. 17-3 at 64-66). Dr. Pouparinas then promptly ordered treatment in accordance with those recommendations.[17] (Id. at 70).

Although Pringle suggests that the need to amputate the toe should have been immediately obvious to Dr. Pouparinas, this assertion is purely conclusory and contradicted by Dr. Pfeiffer's statement to Dr. Pouparinas after examining the toe in February 2018 that Pringle's "ischemic toe problems should resolve with conservative therapy." (See id. at 66). Indeed, the record reflects that the toe problems *had resolved* as of April 24, 2018, when it was noted that the eschar was removed and replaced by new skin that was pink, warm, dry, and intact. (Id. at 70).

When Pringle's left middle toe was again observed to be necrotic in May 2018, it was noted that Pringle had been noncompliant with his Coumadin. (Id. at 129). Thereafter, he was seen at least six times without delay in response to sick call requests or complaints between May 28 and June 15, 2018. (Doc. 17-3 at 127-28; Doc. 17-4 at 2-4, 8-12). During that period, Pringle underwent multiple physical examinations and at least one Doppler ultrasound and was treated with various medications, a

---

[17] Dr. Pfeiffer's consultation report from February 15, 2018 directed: "Alcohol to [left] toe bid – leave open to air." (Doc. 17-3 at 65). On that same date, Dr. Pouparinas ordered the following treatment: "Alcohol to 3rd [left] toe BID, leave open to air." (Id. at 70).

corticosteroid injection, TED hose, heel cups, and wound care. (Doc. 17-3 at 128; Doc. 17-4 at 2-6, 8-12).

On June 8, 2018, Dr. Pouparinas signed a referral request for Pringle to see Dr. Pfeiffer for worsening pain, numbness, and malodor in his left foot. (Doc. 17-4 at 10). Dr. Pfeiffer evaluated Pringle later that month, and after noting a faint/absent signal on Pringle's left ankle-brachial index, absent pedal pulses, and the left saphenous vein graft without flow, he stated that the attempt to save Pringle's left leg had failed and that a left BKA was required. (Id. at 14-16, 19). Dr. Pouparinas signed the referral request for Pringle's left BKA on July 5, 2018, and the amputation was performed on an emergency basis four days later when gangrene was observed in Pringle's foot. (Id. at 21, 28-29).

There is nothing in this record that could support a finding that Dr. Pouparinas's treatment of Pringle's ischemic toe and foot problems was "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." See Harris, 941 F.2d at 1505. Under Dr. Pouparinas's care, Pringle was promptly admitted to the infirmary for his vascular wound with necrosis, treated with antibiotics, pain medication, and wound care, and referred to a specialist/surgeon for evaluation. After the surgeon examined Pringle and recommended certain treatment, Pringle was treated in accordance with those recommendations, with temporary success. Although Pringle's toe problems returned and

his condition worsened starting in May 2018, he continued to receive prompt, substantial treatment for his complaints and appropriate specialist and surgical referrals for his conditions.

Furthermore, the record does not substantiate Pringle's assertion that his left BKA was caused by an inadequately treated toe infection that spread to his lower leg. Pringle claims that that he suffered "the loss of his entire lower left leg – all coming from a bump of his middle toe." (Doc. 22 at 10). However, the medical records reflect that Pringle's left BKA was necessitated by his severe peripheral vascular disease and failed vein graft. When Dr. Pfeiffer stated that Pringle needed a left BKA on June 28, 2019, his treatment notes cited objective findings showing extremely poor circulation in Pringle's left leg but did not mention gangrene or infection. (See Doc. 17-4 at 14-16). And, when gangrene *was* noted from the middle of Pringle's left foot down to his toes on July 9, 2018, he was immediately transported to the hospital for the left BKA surgery. (Id. at 29).

"[W]hen a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989). The mere fact that Pringle, with the benefit of hindsight, challenges the efficacy and course of his treatment is insufficient to show deliberate indifference to his serious medical needs in violation of the Eighth Amendment. See Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) (stating

that whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment") (citation omitted); Harris, 941 F.2d at 1505 (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment).

This is particularly true given that the aggressive treatment Pringle claims should have been provided runs directly counter to the recommendations of his vascular surgeon, and the fact that his toe problems resolved (albeit temporarily) with the conservative treatment provided by the Holman medical staff. Cf. Stewart v. Lewis, 789 F. App'x 825, 829 (11th Cir. 2019) (per curiam) (finding that doctor's denial of prisoner's request for surgery to treat his hammer toe when prisoner had not yet been fitted for his orthopedic shoes did not constitute deliberate indifference, since "more conservative methods had not yet been pursued or deemed unsuccessful").

Because no reasonable juror could find that Dr. Pouparinas acted with deliberate indifference in treating Pringle's ischemic toe and foot problems during his incarceration at Holman, summary judgment is due to be granted in favor of Dr. Pouparinas.

**B. Defendant Wexford.**

As noted *supra*, Wexford is a private entity contracted to provide medical services to ADOC prisoners. "Generally, when the state contracts out its medical care of inmates, the obligations of the eighth amendment attach to the persons with whom the state contracts." Howell v. Evans, 922 F.2d 712, 723–24 (11th Cir.), vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), and opinion reinstated sub nom. Howell v. Burden, 12 F.3d 190 (11th Cir. 1994).

However, Wexford "is not liable for constitutional violations done solely by its employees." Herr v. Armor Corr. Health Servs., Inc., 494 F. Supp. 3d 1197, 1203 (M.D. Fla. 2020). "For § 1983 liability to attach to a private corporation providing prison medical care to prisoners, it must be shown that a prisoner's constitutional rights were violated as a result of an established policy or custom of that corporation." Green v. Preemptive Forensic Health Solutions, 2015 WL 1826191, at *3, 2015 U.S. Dist. LEXIS 52715, at *8 (N.D. Ala. Apr. 21, 2015) (citing Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997)). A custom is "a practice that is so settled and permanent that it takes on the force of the law." McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004) (quotation omitted). "In order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice." Id. (quotation omitted); see also Craig

v. Floyd County, Ga., 643 F.3d 1306, 1311 (11th Cir. 2011) (stating that proof of a single incident of unconstitutional activity is insufficient to show a policy or custom under § 1983 even when the incident involved several employees of the defendant).

Pringle argues that Wexford acted with deliberate indifference by failing to adequately treat his toe and foot. (Doc. 7 at 6, 8). Specifically, Pringle contends that Wexford, which had knowledge of his condition through Dr. Pouparinas, waited too long to order or approve the amputation of his left middle toe or left foot in order to save the remainder of the left lower extremity. (Id. at 8). Pringle claims:

> It is common knowledge, that any medical tools, including surgeries and treatments (must) be approved by Wexford before any medical procedures begins. . . . The [long delays] a corporate policy practiced on many prisoners at Holman, show a pattern by Wexford, to save money. In this case Wexford's policy of long delays from diagnosis until treatment, caused the infection of the toe, to become gangrene.

(Id. at 4).

As an initial matter, it is undisputed that Wexford contracted with ADOC to provide healthcare related services to Alabama state incarcerated inmates starting on March 1, 2018. (See Doc. 17 at 2; Doc. 17-1 at 3). Although Pringle complains of his treatment beginning in January 2018, much of the treatment for problems with

Pringle's left leg, including five surgeries, took place before Wexford assumed the medical contract for Holman.[18]

Moreover, Pringle provides no evidence to support his conclusory allegation that Wexford has a policy of long delays between diagnosis and treatment in order to save money. The medical staff at Holman consistently and promptly responded to Pringle's sick call requests and complaints, and there is no evidence that corporate preapproval was sought or required for the vast majority of Pringle's voluminous treatment, much less that such treatment was significantly or unduly delayed in an effort to save money.

While the record reflects that the Holman medical staff were required to submit referral requests for outside treatment and requests for certain medical devices to Wexford's Utilization Management department, it also reflects that, in Pringle's case, these requests were approved without long or unexplained delays. And even assuming *arguendo* that deliberate indifference could be inferred from the time that elapsed between any single referral request and Pringle's resulting treatment, Pringle has failed to provide or identify evidence showing a series of such delays and has therefore offered no proof that long delays between diagnosis

---

[18] In any event, the record demonstrates that Pringle received timely and adequate treatment for his ischemic toe problems prior to March 1, 2018.

and treatment under Wexford were persistent or widespread.  See Craig, 643 F.3d at 1312 ("Even if we were to assume that employees of Georgia Correctional should have referred Craig to a physician sooner, Craig offered no proof of a policy or custom that was persistent or widespread. . . .  Instead, Craig relies on his own experience, which is, at most, '[p]roof of a single incident of unconstitutional activity.  That proof is 'not sufficient to impose liability' under section 1983.") (internal citations omitted).

Finally, as explained above, Pringle's course of treatment was in accordance with the recommendations of his vascular surgeon, and Pringle offers nothing more than his own opinion and unfortunate medical outcome to show the treatment provided for his toe was obviously inadequate.  The mere fact that Pringle's ischemic toe and foot problems were treated conservatively before his vascular condition worsened cannot be reasonably viewed as evidence of a "policy of long delays from diagnosis until treatment," (see Doc. 7 at 4), particularly given Dr. Pfeiffer's treatment recommendations, Pringle's initially favorable response to conservative treatment, the serious and irreversible nature of the alternative treatment now suggested by Pringle, and the substantial amount of treatment Wexford provided to Pringle during this period.  Simply put, Pringle has presented nothing other than his own unsupported, non-expert opinions to suggest that his course of treatment by the Holman medical staff was improper, much less

that it was the result of Wexford's policy or custom to delay treatment to save money.

Consequently, Defendant Wexford should be granted summary judgment on all claims asserted against it and dismissed from this action.

### C. Post-Amputation Treatment.

As specified in the amended complaint form, Pringle's claims against Defendants Dr. Pouparinas and Wexford relate only to the treatment of his left middle toe and foot *prior* to the amputation of his left lower extremity.[19] (See Doc. 7 at 4-8). However, like his original complaint, Pringle's amended complaint also includes an attached "Statement of Facts" that describes his treatment *both before and after the amputation*, references various persons who provided him medical care at different points in time, and discusses various complaints and grievances that he filed regarding his medical conditions and treatment. (See id. at 11-17).

In the repleading order, the Court informed Pringle that it was not required to comb through his attached narratives in an

---

[19] Pringle's amended complaint form consistently addresses only pre-amputation treatment in all relevant sections, including Section II.G. ("Your claim (briefly explain your claim: what, when, where, who; do not cite cases; you may, without leave of Court, add up to five (5) additional pages if necessary)"), and Section III.B. ("Claim against this defendant" and "Supporting facts (Include date/location of incident)"). (See Doc. 7 at 4-8).

effort to discern which claims he was attempting to raise and which persons he was attempting to assert claims against. (Doc. 6 at 3-4). Instead, the Court specifically directed Pringle to "identify each individual he intends to include as a Defendant in this action, along with the facts supporting Pringle's claims against that Defendant," in Section III of the § 1983 prisoner complaint form. (Id. at 9). The Court stressed that while Pringle was free to add additional pages in drafting his amended complaint, he was required to strictly follow the format contained in Section III of the form complaint for each Defendant and to identify his claim against each Defendant in that section. (Id.).

Despite the Court's clear directives, Pringle again attached a loosely organized "Statement of Facts" to his amended complaint, which arguably expands the scope of the medical treatment claimed to be constitutionally inadequate. Specifically, the "Statement of Facts" references various grievances or complaints Pringle made about his medical treatment or conditions *after* his left BKA. These include complaints that Pringle did not receive physical therapy soon enough after his amputation, that his prosthesis did not fit properly and caused him pain, that he was not ordered or approved for "reconstructive surgery" to help him wear his prosthesis, and that he was not provided the prosthetic shoes he requested.

The Court is mindful of its obligation to construe *pro se* pleadings liberally. See Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam). However, given the specific directions in the repleading order and the fact that Pringle's amended complaint form addresses only pre-amputation treatment both in the description of his claim (Section II.G.) and in the supporting facts for his claim against each of the two Defendants (Section III.B.), Pringle's oblique references to various complaints and grievances cannot be reasonably viewed as stating Eighth Amendment claims relating to his post-amputation medical treatment. Indeed, given Pringle's references to multiple individuals and his failure to specify what any individual or entity did or did not do after the amputation that violated his constitutional rights, it is unclear which persons or entities Pringle might be asserting such a claim against.[20]

Assuming *arguendo* that Pringle's assorted complaints could be reasonably construed as asserting claims against Wexford relating to his post-amputation medical treatment, such claims find no support in the record. Two days after Pringle's left BKA, he was admitted to Holman's infirmary, where pain medication was

---

[20] Pringle's amended complaint contains no allegations against Dr. Pouparinas relating to post-amputation treatment. (See Doc. 7). The Court notes that Dr. Pouparinas appears to have left Holman in September or October 2018. (See Doc. 17-4 at 96, 99-100, 103; Doc. 17-5 at 1, 4).

administered, and his surgical site was cleaned twice daily and monitored for infection. (Doc. 17-4 at 44, 47). On July 18, 2018, it was noted that Pringle was "requesting to be released from the ward," and he was provided education on improving his mobility and strength. (Id. at 69). On July 24, 2018, Pringle stated his concern that he was growing weak and was referred for physical therapy. (Id. at 73-74).

At a follow-up visit to Dr. Pfeiffer on August 2, 2018, it was noted that Pringle was doing well with no problems, and that his surgical wound was "fine." (Id. at 75-76). Dr. Pfeiffer recommended that Pringle's remaining surgical staples be removed in three weeks,[21] and that Pringle return to see him in three months.[22] (Id. at 76, 78).

On August 22, 2018, Pringle attended an initial physical therapy evaluation at Atmore Community Hospital's Physical Therapy Department ("ACHPTD"). (Id. at 86-87). At the initial evaluation,

_____

[21] Pringle's remaining surgical staples were removed on August 23, 2018. At that time, it was noted that the surgical wound was well-healed except for a one-centimeter scabbed area to the medial portion. (Doc. 17-4 at 89). Pringle was provided crutches on August 28, 2018. (Id. at 91).

[22] A referral request for Pringle's three-month follow-up with Dr. Pfeiffer was completed on August 3, 2018, and the follow-up appointment was scheduled for November 1, 2018. (Doc. 17-4 at 80). On November 1, 2018, Dr. Pfeiffer noted that Pringle was doing well, with no new medical or post-surgical problems, and he requested that Pringle follow up again in six months. (Id. at 112-13).

Pringle reported that he was doing well getting around in a wheelchair and could transfer himself independently, but that he did not walk and was motivated to get a prosthesis. (Id. at 86). The therapist noted that Pringle's surgical incision was healing well, but he had developed tightness in his left hip flexors and a "knee flexion contracture which will be a hindrance to prosthetic fitting and optimal use and walking." (Id.). However, she noted that Pringle had "good potential to be independent with prosthesis when appropriate to be fitted." (Id.). The physical therapist gave Pringle a home exercise program and requested that he return for therapy twice a week for four weeks for strengthening and stretching. (Id. at 86, 88).

On August 29, 2018, Pringle was seen by the Holman medical staff after complaining of cramps at his amputation site when he moved the left lower extremity. (Id. at 92-93). Pringle was instructed to "continue exercising extremity." (Id. at 92). At the chronic disease clinic on September 6, 2018, Dr. Pouparinas noted that Pringle was doing well but having some phantom pain due to his recent amputation, and that he was "currently going to physical therapy." (Id. at 96). He directed Pringle to "continue PT." (Id.).

On September 24, 2018, Pringle submitted an Inmate Request for Accommodations Form requesting physical therapy and asserting

that it was being denied.[23] (Id. at 97). A referral request for physical therapy was submitted on October 1, 2018.[24] (Id. at 99, 103). The referral request was approved, and Pringle was scheduled for eight physical therapy sessions at ACHPTD. (Id. at 103).

Following Pringle's first physical therapy session on October 25, 2018, the therapist noted that his residual limb was healing and shaping well, and his strength was good, but tightness in his hip flexors and hamstrings would limit his gait "post prosthetic fitting." (Id. at 107). After Pringle's eighth and final session on November 20, 2018, the physical therapist stated that Pringle was ready for prosthetic fitting and recommended holding off on further therapy until after Pringle received his prosthesis.[25] (Doc. 17-5 at 22).

On December 20, 2018,[26] prosthetist Mark Caldwell ("Caldwell") of BioTech Limb and Brace ("BioTech") evaluated Pringle at Holman and noted that he would return for a test socket fitting for

---

[23] The Facility ADA Coordinator noted on the form: "Inmate has been referred to Medical." (Doc. 17-4 at 97).

[24] Notably, the referral request was signed by Shawn Geohagan, CRNP as Site Medical Provider and did not include the signature of a Site Medical Director. (See Doc. 17-4 at 99, 103).

[25] A referral request for Pringle's prosthetic fitting was completed on November 29, 2018. (Doc. 17-5 at 32-33).

[26] The prosthetic fitting appointment was originally scheduled for December 13, 2018, but it was subsequently rescheduled to December 20, 2018. (Doc. 17-5 at 33, 38).

Pringle's left leg.[27]  (Id. at 36).  When he returned for testing on February 28, 2019, Caldwell noted that the socket fit well, and that he would return to deliver Pringle's finished prosthesis and supplies.[28]  (Id. at 49).  Upon delivery of Pringle's prosthesis equipment on March 19, 2019, Caldwell noted that the supplies and prosthesis fit well, that Pringle was able to don and doff the prosthesis independently and walk with crutches, and that Pringle would continue with therapy.  (Id. at 58).

On April 1, 2019, Pringle submitted a sick call request complaining that he needed an adjustment of his prosthesis and size 11 prosthetic shoes.  (Id. at 59).  The next day, Pringle presented to the clinic and reported sharp pain and maladjustment of his prosthesis.  (Id. at 61).  It was noted that Pringle would be referred to the prosthetic supplier for adjustment.  (Id.).  On April 12, 2019, a nurse practitioner evaluated Pringle and noted

_____

[27] A referral request for fit testing of the leg socket for the prosthesis was completed on December 28, 2018.  (Doc. 17-5 at 37). On January 2, 2019, Wexford's Utilization Management Physician, Dr. Hood, declined to authorize the request based on insufficient information and requested an estimate from BioTech.  (Id. at 42). On January 8, 2019, the Holman medical staff filed an appeal of this decision and forwarded an estimate from Biotech dated January 3, 2019 and notes from Pringle's December 20, 2018 evaluation. (Id. at 41).  Dr. Hood sent the estimate and notes for third-party review.  (Id.).  Biotech submitted an updated estimate on February 5, 2019, which Dr. Hood approved on February 12, 2019.  (Id. at 46-47).

[28] A referral request for delivery of Pringle's prosthesis and supplies was completed on March 4, 2019.  (Doc. 17-5 at 57).

that he needed his prosthesis adjusted and a shoe for his prosthesis so he "can receive physical therapy for ambulating with prosthesis."[29] (Id. at 60).

Caldwell returned to check Pringle's prosthetic fitting on May 9, 2019. (Id. at 70). He noted that minor alignment changes and slight lengthening of the prosthesis helped, that the socket fit appropriately, and that Pringle needed physical therapy to strengthen his quadriceps and improve his balance. (Id. at 70).

On May 20, 2019, Pringle submitted an Inmate Request for Accommodations Form requesting "reconstructive surgery" to repair ligament damage from his earlier surgeries and alleging "improper after care not providing therapy after surgery."[30] (Id. at 72). On May 26, 2019, Pringle placed a sick call request and reported that his left knee was swollen. (Id. at 74). He was seen by a nurse on May 28, 2019, who noted that he was unable to straighten his leg and get a proper prosthetic fit. (Id. at 75). She administered Tylenol and referred him to a provider. (Id.).

---

[29] A referral request for "[p]rosthetic leg adjustment/repair and shoe to fit prosthetic foot" was completed on April 19, 2019 and authorized on April 23, 2019. (Doc. 17-5 at 62, 65). In the referral request, it was noted that Pringle's prosthesis was loose at every joint and unstable, and that Pringle was waiting on a shoe to fit his prosthetic foot. (Id. at 62).

[30] The Facility ADA Coordinator noted on the form: "Referred to medical for evaluation. (Also evaluate for shoes [illegible] request)." (Doc. 17-5 at 72).

On June 7, 2019, Pringle was seen by a nurse practitioner for inspection of his amputation stump. (Id. at 65). He complained of soreness at the amputation site and reported that he was unable to tolerate even standing on the prosthesis. (Id.). The practitioner noted that Pringle's stump was soft with poor progress made toward toughening the skin for prosthesis use, that the left knee was unable to fully extend, and that there was tightening of the left knee joint posteriorly. (Id.). She assessed Pringle with a left knee contracture and referred him to physical therapy to improve his knee flexibility.[31] (Id. at 65, 76-77).

Pringle attended three sessions at Voyager Physical Therapy between June 18 and July 19, 2019. (See Doc. 17-6 at 11-12, 14). On July 19, 2019, the physical therapist stated that Pringle had made some strength and range of motion gains but continued to be discontent with the fitting of his left stump socket, which was interfering with his gait and progression. (Id. at 11). The physical therapist suggested another consultation with BioTech and construction of a new socket. (Id.).

On July 26, 2019, Pringle reported that his physical therapy sessions were not effective and complained of pain at his amputation site. (Id. at 15). He given a prescription for

---

[31] The referral request was signed on June 7, 2019, three physical therapy sessions were approved, and Pringle's first physical therapy appointment was set for June 18, 2019. (Doc. 17-5 at 76-77).

Tylenol.  (Id.).  On July 28, 2019, Pringle complained of left knee pain due to falling in the kitchen, and he reiterated that his prosthesis did not fit properly.  (Id. at 19, 28).  A left knee x-ray was ordered, which showed increased density of the soft tissues at the distal stump secondary to mechanical irritation from the prosthesis.  (Id. at 28, 32).  On August 22, 2019, Pringle was seen by Dr. Pfeiffer, who noted his left knee flexion contracture and opined that Pringle "needs more extensive physical therapy and modification of prosthesis."[32]  (Id. at 41).

On October 2, 2019, Pringle submitted a sick call request for reconstructive surgery to enable him to wear his prosthesis.  (Id. at 55).  On October 16, 2019, Pringle was examined by a nurse after placing another sick call request complaining of pain when placing his elastic sleeve on his surgical stump.  (Id. at 53-54).  On October 25, 2019, Pringle told Holman staff doctor Jeana Blalock, M.D. that he was not wearing his prosthesis at all because of the pain it caused him.  (Id. at 60).

On November 5, 2019, Caldwell returned to Holman for another prosthetic adjustment.  (Id. at 64).  In his consultation report,

---

[32] A referral request for Pringle to be seen again by BioTech for his ill-fitting prosthesis was submitted on August 20, 2019.  (Doc. 17-6 at 34).  Dr. Hood initially declined to authorize the request based on insufficient information and requested the notes from Pringle's last physical therapy visit.  (Id. at 47).  After receiving and reviewing the physical therapy notes, Dr. Hood approved the referral request on September 12, 2019.  (Id. at 56).

Caldwell stated that Pringle's knee flexion contracture seemed to have progressed, that Pringle was currently "a very limited candidate for prosthesis" because of his severe knee flexion contracture, and that Pringle would likely benefit from a revision/hamstring release surgery to improve his range of motion. (Id.). Caldwell noted:

> [Patient] was informed that here was little else we could do to his current prosthesis. He was also informed of bent knee prosthesis designed for minimal ambulation which allow for weight bearing & transfers. Given the patient's anatomy limitations there is little that can be done currently to make him a community ambulator.

(Id.).

On November 26, 2019, Dr. Blalock discussed Pringle's prosthesis issues on a collegial call, and it was determined that she would follow up with Dr. Pfeiffer for formal recommendations about a stump revision and obtain Pringle's 2018 physical therapy records from ACHPTD.[33] (Id. at 65).

---

[33] Dr. Blalock wrote to Dr. Pfeiffer requesting his opinion regarding a possible left BKA revision. In her letter, Dr. Blalock provided her telephone number and noted: "Brace company representative told the patient, me, and Ms. Stewart that outside of the prison that they would do a stump revision or some sort of release to help his prosthesis fit better. He stated that the prosthesis will never fit comfortably due to the anatomy of his stump and his contracture. . . . Prosthesis rep stated he'd have patient go for a second opinion if he wasn't in prison. He also stated that if no revision surgery was going to be done a different type of prosthesis may be beneficial (bent knee prosthesis) but he did state that this prosthesis will make the contracture worse." (Doc. 17-6 at 75).

In a progress note dated December 10, 2019, Dr. Blalock wrote:

> Spoke to Dr. Pfeiffer by phone about POC on patient.
> Dr. Pfeiffer stated that the fact that Mr. Pringle has
> a flexion contracture is evidence of noncompliance
> w[ith] PT program. He stated that given this, he does
> not think he is a good candidate for a revision. Dr.
> Pfeiffer stated that any tendon release or similar
> procedure would cause instability of the knee. He states
> he does not think he will do well with the bent knee
> prosthesis. Based on this [patient] will need to
> continue ambulating w[ith] crutches or use wheelchair.
> Discussed w[ith] Dr. Hood today in collegial call who
> agrees with this plan.

(Id. at 67).

Pringle returned to Dr. Pfeiffer for a follow-up visit on May 1, 2020.[34] (Doc. 17-7 at 41-43). Following the office visit, Dr. Pfeiffer wrote a letter to the Holman staff stating:

> Mr. Pringle was recently seen following unsuccessful
> attempts to salvage his left leg following a previous
> bypass procedure performed four years ago. Apparently,
> he has not been seen since June of last year and his
> primary complaint is his inability to use the
> prosthesis.
>
> He has a flexion contracture which has been present ever
> since he was discharged from the hospital. The
> prosthesis apparently has not been able to be fitted
> well.

―――――――――――――

[34] A referral request for Pringle to see Dr. Pfeiffer was submitted on March 6, 2020. (Doc. 17-6 at 90). The referral request noted: "[patient] states for past few weeks has felt weakness in [right lower extremity], same symptoms he had before the BKA Left, also may possible need a revision surgery on L BKA due to contracture and ill fitting prosthesis/need rec." (Id.). The referral request was authorized on March 12, 2020, and an appointment was scheduled for April 10, 2020. (Id.). The appointment was later rescheduled to May 1, 2020 because of the COVID-19 pandemic. (Doc. 17-7 at 22).

Contrary to the patient's recollection, the patient had
a splint placed on his left leg after his amputation,
which is standard practice and he was given instructions
about physical exercise and therapy in the immediate
post-operative period.

I do not believe anything else can be done at this point
in time to straighten it.

(Id. at 39).

Notwithstanding Dr. Pfeiffer's recommendations, a referral
request for Pringle to consult with an orthopedic surgeon to
evaluate the possibility of a left BKA revision surgery was
completed on May 6, 2020. (Id. at 47). On May 18, 2020, Dr. Hood,
after noting Pringle's history and Dr. Pfeiffer's recommendations,
declined to authorize the request and opted to "continue plan of
conservative onsite [management]/observation – patient to continue
use of [wheelchair]/crutches – rediscuss as needed." (Id. at 53).
However, on June 25, 2020, Pringle was evaluated by orthopedic
surgeon Frank Fondren, M.D., who indicated that Pringle needed
modification of his prosthesis and recommended referral to Hanger
Clinic in Mobile.[35]  (Id. at 66).

On July 24, 2020, Pringle was seen by clinician Ray Gatlin,
CPO ("Gatlin") at Hanger Clinic. (Id. at 82-89). Gatlin noted
that Pringle had lost significant volume in his residual limb since
his current prosthesis was made and stated that all parts of

---

[35] A referral request for Pringle to visit Hanger Clinic was
submitted on June 26, 2020 and approved on July 10, 2020. (Doc.
17-7 at 68).

Pringle's current prosthesis needed to be replaced. (Id. at 86-87). He recommended a new prosthesis.[36] (Id. at 87).

Pringle was approved for a new prosthesis and attended a test socket appointment at Hanger Clinic on September 24, 2020. (Doc. 17-8 at 1, 14-15). He presented to Hanger Clinic again on October 2, 2020, for delivery and fitting of his new prosthesis. (Id. at 20). On that date, Gatlin noted that the fit and function of the new prosthesis were good, and that Pringle walked well with a walker and reported he was comfortable. (Id.). Gatlin recommended physical therapy to help Pringle learn to walk with the prosthesis.[37] (Id.).

On October 28, 2020, Pringle returned to Voyager Physical Therapy for the first of three additional physical therapy sessions. (Id. at 39). He reported that his new prosthetic limb was working much better than his first one, expressed no complaints of discomfort or pressure points, and stated that he had been wearing the prosthesis almost daily and was now in the process of weaning off crutches. (Id.). The therapist noted that Pringle was "excelling with this limb" and would return in two to three weeks for the second of his three planned sessions. (Id.).

---

[36] Hanger Clinic submitted an estimate for a new prosthesis on August 19, 2020, and the estimate was approved. (Doc. 17-7 at 101-02; Doc. 17-8 at 1).

[37] A referral request for physical therapy was completed on October 7, 2020. (Doc. 17-8 at 27).

On November 16, 2020, Pringle submitted a sick call request for readjustment of his prosthesis,[38] size 11 prosthetic shoes, and a crutch to replace his cane. (Id. at 45). He was provided a cane that day and was seen by a doctor at Holman two days later. (Id. at 46-48). He reported discomfort and instability due to his prosthesis shifting and causing the left leg to be shorter than the right leg. (Id. at 48). He was referred to Hanger Clinic. (Id. at 50).

Pringle visited Hanger Clinic on December 7, 2020. (Id. at 55-57). In the provider consultation report from that visit, Gatlin stated that he had adjusted the prosthesis, but the sealing sleeves needed to be longer to ensure a seal and prevent bunching, and he noted that he would order longer sleeves and fit them to Pringle once they arrived.[39] (Id. at 66).

Pringle had another physical therapy session on December 9, 2020. (Id. at 59). He reported that his gait with the new prosthesis continued to improve and was noted to have better balance and increasing strength in the left residual limb. (Id.). However, Pringle explained that he didn't feel as though he was deep enough into his socket and was informed by the therapist that

---

[38] Pringle stated that his left leg was shorter than his right leg, causing pressure to his lower back. (Doc. 17-8 at 45).

[39] A referral request for Pringle's follow-up visit to Hanger Clinic was completed on December 10, 2020. (Doc. 17-8 at 63).

this would improve if he was able to increase his left knee extension.  (Id.).

Pringle was seen again at Hanger Clinic on December 23, 2020 for delivery of his new sealing sleeves.  (Id. at 68).  Gatlin noted that Pringle's new sleeves fit well and were comfortable. (Id.).

Pringle returned to Voyager Physical Therapy for the last of his three sessions on January 6, 2021. (Id. at 81).  On that date, the therapist noted that Pringle's prosthesis fit better than ever and felt more secure after receipt of the new suspension sleeve. (Id.).  Pringle reported that his gait continued to improve, and that he was able to ambulate without a cane and was even starting to do stairs.  (Id.).  The therapist concluded: "Goals met and no further treatments are planned at this time.  He did real well." (Id.).

On January 22, 2021, Pringle submitted a sick call request for "prosthetics therapeutic shoes."  (Id. at 86).  The next day, Pringle presented to Holman's clinic stating that he needed a prosthetic shoe for better posture and walking and was "entitled to have them."  (Id. at 85).  Pringle reported no pain or discomfort, but he did report an alteration in comfort when walking.  (Id. at 87).

To the extent Pringle's amended complaint can be construed as raising claims of deliberate indifference to his serious *post-*

*amputation* medical needs against Wexford, those claims lack evidentiary support. With respect to Pringle's assertion that he did not receive therapy soon enough after his amputation,[40] he fails to identify evidence showing that earlier physical therapy was medically necessary or that his condition worsened as a result of a delay in physical therapy. Specifically, there is no evidence that Pringle's knee flexion contracture and prosthesis fitting difficulties were caused by a delay in physical therapy. On the contrary, the physical therapist observed the contracture at Pringle's initial evaluation on August 22, 2018. While there was some delay between Pringle's initial physical therapy evaluation on August 22, 2018 and the October 1, 2018 referral request for eight additional sessions, there is nothing suggesting that this delay was anything other than inadvertent. Further, the medical record summarized above reflects that the delay in submitting the referral request for additional therapy was an isolated occurrence rather than a persistent and widespread practice.

With respect to Pringle's complaints that his prosthetic leg did not fit properly and caused him pain, the record firmly negates any assertion of deliberate indifference by Wexford. In response

---

[40] Although Pringle's specific complaint regarding physical therapy is not clear, he appears to complain of the interval between his initial physical therapy evaluation at ACHPTD on August 22, 2018, and the first of his eight subsequent physical therapy sessions on October 25, 2018. (See Doc. 22 at 5).

to Pringle's complaints regarding his first prosthesis, referral requests were submitted and approved for Pringle to be seen twice by the prosthesis provider for inspection and adjustment of his prosthesis, and for physical therapy. When these efforts were unsuccessful, the Holman medical staff conferred with Dr. Pfeiffer regarding a possible revision surgery or bent knee prosthesis and were advised that neither was a good option. Despite Dr. Pfeiffer's repeated opinions that a left BKA revision surgery would be futile, the Holman medical staff submitted a referral request for Pringle to be evaluated by an orthopedic surgeon regarding a possible revision surgery.[41] And, although this request was initially (and reasonably) denied by Dr. Hood based on Pringle's prior treatment and Dr. Pfeiffer's recommendations, Pringle was evaluated by an orthopedic surgeon shortly thereafter, who recommended that he be referred to Hanger Clinic, where he was ultimately fitted successfully for a new prosthesis.

---

[41] To the extent Pringle asserts that Wexford was deliberately indifferent by not approving his requests for "reconstructive surgery" to help him wear his prosthesis, he has identified no evidence that such a surgery was medically necessary or even appropriate. Dr. Pfeiffer opined that such a surgery was unnecessary and likely to be unsuccessful and cause knee instability. (Doc. 17-6 at 67; Doc. 17-7 at 39). Dr. Fondren recommended modification of Pringle's prosthesis rather than a revision surgery (Doc. 17-7 at 66), and the record reflects that Pringle's new prosthesis from Hanger Clinic fit and worked well despite the lack of a revision surgery. (See, e.g., Doc. 17-8 at 68, 81).

Finally, to the extent Pringle alleges deliberate indifference based on a delay or failure to provide him with a shoe for his new prosthesis, he has not shown a serious medical need for a prosthetic shoe or that his condition was worsened by any delay.  Although Pringle himself requested prosthetic shoes from the Holman medical staff and claimed he was "entitled" to them after receiving his new prosthesis, the record is devoid of any statement by a medical provider, including those from Hanger Clinic or Voyager Physical Therapy, that a shoe was necessary or beneficial with his new prosthesis.[42]  Indeed, the most recent records from those providers reflect that Pringle's new prosthesis fit well and felt secure and comfortable, and that Pringle met all of his physical therapy goals and was ambulating well without any assistive device.  Even when Pringle presented to the clinic requesting prosthetic shoes on January 23, 2021, he was not noted to have pain or discomfort and reported only alteration in comfort when walking.

Given the foregoing, a reasonable juror could not find that Pringle experienced deliberate indifference to a serious medical

---

[42] Notably, Pringle was seen at both Hanger Clinic and Voyager Physical Therapy after he first requested prosthetic shoes from the Holman medical staff in November 2020, but the notes from those providers did not mention any complaints regarding a lack of prosthetic shoes and did not indicate that prosthetic shoes were needed or beneficial.  (See Doc. 17-8 at 45, 55-57, 59, 66, 68, 81).

need following his left BKA, or that Wexford had a policy or custom of delaying or denying inmates necessary medical treatment. Thus, assuming *arguendo* that Pringle's amended complaint can be construed as asserting claims against Wexford relating to his post-amputation treatment, it is recommended that summary judgment be granted in favor of Defendant Wexford on such claims.

## IV.    CONCLUSION

Based on the foregoing, it is recommended that summary judgment be **GRANTED** in favor of Defendants Dr. Pouparinas and Wexford, and that Plaintiff Pringle's claims against Defendants be **DISMISSED with prejudice.**

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the

provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this **12th** day of **January, 2022.**

**/s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**
